463 P.2d 537

**ALLAN C. JEFFRYES REALTY, INC.,**
Appellant,

v.

**Roy L. RUCKER and Jane Doe Rucker, individually and as husband and wife, Rucker Equipment Co., a corporation, Jack T. Helm and Helen L. Helm, individually and as husband and wife, Z. T. Helm and Maude E. Helm, individually and as husband and wife, and Triple H. Land & Development Co., a corporation, Appellees.**

No. 9680.

Supreme Court of Arizona

In Division.

Jan. 14, 1970.

Rehearing Denied Feb. 3, 1970.

Hill & Savoy, by John E. Savoy, Phoenix, for appellant.

Dowdall, Harris, Hull & Terry, Tucson, for Rucker Equipment Co.

Stark, Larson & Wood, Phoenix, for Triple H. Land & Development Co.

UDALL, Justice:

This is an appeal by the plaintiff from a judgment in favor of the defendants, rendered by the Superior Court of Maricopa County, sitting without a jury. The facts are as follows:

Plaintiff is a corporation, controlled by Allan C. Jeffryes, a licensed Phoenix real estate broker who sells businesses as well as real estate. Defendant Triple H. Land Development Co. is a Phoenix-based corporation controlled by Mr. Helm. Defendant Rucker Equipment Co. is a Tucson-based corporation controlled by Mr. Rucker. While other individuals were originally named as co-defendants, the basic quarrel is between the three corporations which we shall refer to as Jeffryes, Helm, and Rucker respectively.

Plaintiff sued both defendants for commissions which he alleges that he earned by bringing them together before they exchanged the properties which each had listed with Jeffryes for sale or exchange.

On March 19, 1964, Paul Goff, an authorized agent of Rucker, listed Rucker's business with Jeffryes for sale or exchange. The business, located in Tucson, included land, inventory, $35,000 worth of accounts receivable, and the Allis Chalmers dealership franchise. The total asking price was $140,000. A few days later, Helm listed with Jeffryes his 11-unit apartment building in Phoenix, in which he had a $44,000 equity over and above the mortgage on it. Each, in listing his property, executed a written "Exchange Commission Agreement", promising to pay Jeffryes a commission for his services, in the event of his "consummating an exchange of the above property on any terms agreed upon."

Since both defendants had indicated a willingness to trade rather than to sell, Jeffryes was quick to sense that an exchange of their properties was a natural, and he promptly brought the owners together. Prior to the meeting arranged by Jeffryes, defendants were total strangers to each other. After offers and counter-offers, the defendants, on March 27, 1964, signed an agreement by which Helm's $44,000 equity in the apartment became the down-payment on Rucker's $140,000 worth of assets, and the balance of $96,000 was to be paid in monthly installments extending over 15 years. Though the language of the agreement is rather vague, there is sufficient evidence to justify the trial court's finding that the execution of the agreement was contingent upon securing Allis Chalmers' consent to the transfer of its dealership from Rucker to Helm.

While waiting for word from Allis Chalmers, each defendant inspected the other's properties and appeared to be satisfied, subject to minor adjustments.

On April 15, 1964 the parties were informed that Allis Chalmers would not consent to Helm's becoming its new dealer unless the accounts receivable were eliminated from the deal. The contract thus could not be executed as written. Jeffryes, therefore, called both defendants to his office and attempted to hammer out a new agreement. Both defendants were still interested in the exchange, and Jeffryes drew up a new contract excluding the accounts receivable from the exchange. Helm signed it, but Rucker refused to do so unless (1) Jeffryes reduced his commission to 10% of the new selling price of approximately $105,000, and (2) Jeffryes agreed to take his commission out of the monthly payments, since Rucker was

receiving no cash with which to pay it. Jeffryes demonstrated a willingness to take $5,000 cash and $9,000 in installments, but he would not reduce the total amount. Helm refused to put up any cash. Since Rucker had no access to any cash to pay any part of the commission, he refused to sign. At this point the evidence is in conflict. Rucker testified that Jeffryes "threw me out of his office," and shouted: "The deal is dead. There is no deal. Get out." Helm testified that "Jeffryes told me that the deal was off." Goff testified that Jeffryes threatened the deal "a number of times within a short period of time," and that when Jeffryes was told that the deal would die because of his refusal to reduce his commission, Jeffryes said: "Okay, the deal is dead. Get out; the deal is dead, go home." Robert Stark, a Phoenix attorney testified that Jeffryes was in his office the next day and told him that the deal was dead. Jeffryes claimed that Rucker left while the final agreement was being typed, promised to return and sign it, but never came back. He also testified that he did not refuse to do any more work on the agreement. *However, he made no attempt to testify in rebuttal, after Rucker, Helm, Goff, and Stark had testified, so their testimony remains uncontradicted by any direct testimony.*

The trial court found that Jeffryes told Goff and Rucker that the deal was dead, whereupon they left Jeffryes' office and never again discussed the transaction with him. This finding is abundantly supported by uncontradicted evidence. Jeffryes claims that on the following day attempts were made, without success, to contact Rucker and Goff, and that he delivered the latest version of the exchange agreement to attorney Stark's office. In view of Jeffryes' prior declaration that the deal was dead, his subsequent change of heart was more an attempt to revive a dead deal than a continuation of pending negotiations.

Jeffryes' position and arguments are based upon the theory that when he produced Rucker's signature to the original contract, his fee was earned and could not be lost by any subsequent default by Rucker. Unfortunately for this theory, we have recently affirmed the principle that a broker does *not* earn his commission by obtaining a prospect who is willing to buy only upon a condition which may or may not be fulfilled. Trimmer v. Ludtke, 105 Ariz. 260, 462 P.2d 809 (12/22/69).

We are bound by the trial court's findings that there was an abandonment of the negotiations on April 15, 1964. Grant v. White, 103 Ariz. 257, 439 P.2d 828. Up to the time of the abandonment no commission had been earned. After the abandonment no meeting ever took place between Jeffryes and Rucker. Therefore no commission was earned at any time. It is true that the defendants were so anxious to trade properties that nine days after April 15, they concluded the exchange on terms almost exactly the same as Jeffryes had proposed earlier, but the new deal was not the result of any efforts exerted by Jeffryes after he had abandoned the negotiations.

The facts in Rabkin v. Calhoun, 83 Ohio App. 222, 81 N.E.2d 241 are almost identical with the instant case, except that in Rabkin the broker did not resume his efforts after his abandonment. The court there said:

"* * * the employment contract * * * was terminated and abandoned by the act of the plaintiff before the sale was consummated * * * it clearly appears that when Thompson refused to purchase the property for $4250.00 the plaintiff not only terminated his relationship with Thompson, but abandoned his employment with defendant. Where the broker abandons his employment entirely and all negotiations are broken off, the broker is not entitled to a commission if his employer subsequently through his own efforts consummates a sale with the same purchaser."

Judgment of the Superior Court affirmed.

LOCKWOOD, C. J., and STRUCK-MEYER, J., concur.